**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


ESSEX INSURANCE COMPANY,

      Plaintiff,

v.                                       Civ. No. 15-289 GBW/SCY

MCCLELLAN-VICK CONSULTING, INC.,
and THE ESTATE OF JUDSON VALDEZ,

      Defendants.


<u>**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**</u>

      This matter comes before the Court on Essex's Motion for Summary Judgment (*doc. 30*).  Having reviewed the motion, the attendant briefing, and the relevant law, and being otherwise fully advised, the Court will GRANT Essex's motion.

**I.**      **BACKGROUND**

      This case stems from a dispute between the parties regarding whether Essex Insurance Company ("Essex") is required to defend McClellan-Vick Consulting, Inc. ("MVCI") and the Estate of Judson Valdez in connection with the New Mexico state court action entitled *Tony F. Ortiz, as personal representative of the Estate of Pedro Mendoza, and Elda Mendoza-Ortega v. Energen Resources Corporation, et al*, Case No. D-101-CV-2014-00831 (hereafter referred to as the "Underlying Litigation").  *Doc. 30* at 2.  In the Underlying Litigation, the plaintiffs assert various tort claims stemming from an

August 6, 2013 motor vehicle accident.  *Id.*

Essex had provided a general liability insurance policy to MVCI from August 1,

2013 to August 1, 2014.  *Doc. 30* at 2.  On April 10, 2015, Essex filed this suit seeking a

declaratory judgment that, under the terms of MVCI's insurance policy, Essex owes no

obligations to either MVCI or the Estate of Valdez relating to the Underlying Litigation.

*Doc. 1.*

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden

of "show[ing] 'that there is an absence of evidence to support the nonmoving party's

case.'"  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this

burden, the non-moving party is required to designate specific facts showing that "there

are . . . genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

The court's role is not to weigh the evidence or determine credibility, but rather

merely to assess whether a genuine issue exists as to material facts requiring a trial.  *See

Anderson*, 477 U.S. at 249, 255.  "[T]o survive the . . . motion, [the nonmovant] need only

present evidence from which a jury might return a verdict in his favor." *Id.* at 257.

Furthermore, the court must resolve reasonable inferences and doubts in favor of the

non-moving party, and construe evidence in the light most favorable to the non-moving

party. *See Hunt v. Cromartie*, 526 U.S. 541, 551-54 (1999). However, "viewing the

evidence in the light most favorable to the nonmovant, it is not enough that the

evidence be merely colorable or anything short of significantly probative." *Hall v.*

*Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991) (internal quotations omitted); *see also Anaya*

*v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1197 (D.N.M. 2009) ("The mere existence of a

scintilla of evidence will not avoid summary judgment."). As with any fact asserted by

a party in a summary judgment motion, the nonmovant must point the Court to such

support by "citing to particular parts of materials in the record . . . ." Fed. R. Civ. P.

56(c) (1)(A). Further, all material facts set forth in the motion and response which are

not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

### III.   UNDISPUTED FACTS

1.   In the Underlying Litigation, the plaintiffs allege that, at all relevant times,

MVCI was performing consulting services at the Energen Corporation

("Energen") oil well site and that an MVCI employee, Judson Valdez, was

supervising the work and operations at the well site. *Doc. 30* at 5; *doc. 31* at 2.

2.   In the Underlying Litigation, the plaintiffs allege that Pedro Mendoza was an

employee of Professional Well Services ("PWS"). *Doc. 30* at 5; *doc. 31* at 3.

3

3. In the Underlying Litigation, the plaintiffs allege that Mr. Valdez instructed Mr.
   Mendoza to drive a vehicle owned by PWS from one well site to another. *Doc.
   30* at 5; *doc. 31* at 3.

4. In the Underlying Litigation, the plaintiffs allege that the vehicle was being
   used by PWS to provide oil and gas well services. *Doc. 30* at 5; *doc. 31* at 3.

5. In the Underlying Litigation, the plaintiffs allege that, as Mr. Mendoza drove
   the vehicle southbound on NM State Road 537, the vehicle rolled over onto its
   side, causing an ensuing motor vehicle wreck that resulted in the death of Mr.
   Mendoza. *Doc. 30* at 6; *doc. 31* at 3.

6. The vehicle was a 4-axle 1970 SKYT (Skytop carrier) with a Wyoming license
   plate (Number 19-422) and carried a large pump and 100-barrel water tank,
   both of which were permanently attached[1] to the vehicle. *Doc. 30* at 6, 14; *doc.
   31* at 3.

7. In the Underlying Litigation, Ramon Desotto testified in his deposition that a
   Skytop brand carrier, like other carriers, is the driving mechanism on which
   one can transport equipment, such as a water tank and a pump. *Doc. 30* at 6;
   *doc. 31* at 3.

8. In the Underlying Litigation, Mr. Desotto testified that the Skytop carrier was

---

[1] In its motion, Essex asserts that the pump and well servicing equipment were permanently attached to the vehicle. *Doc. 30* at 14, 21. In its response, MVCI does not address whether the equipment is permanently attached. *See, generally, doc. 31*. As a result, the Court considers this fact to be undisputed. *See* D.N.M.LR-Civ. 56.1(b) (all material facts set forth in the motion and response which are not specifically controverted are deemed undisputed).

operated on roads when it did not have water in the tank.  *Doc. 30 at 6; doc. 31 at 3-4.*

9.  In the Underlying Litigation, the plaintiffs allege that operation of the Skytop Carrier required a driver to have appropriate commercial motor vehicle credentials (CDL license).  *Doc. 30 at 6; doc. 31 at 4.*

10.  NMSA § 66-5-54 states in part that a commercial motor vehicle "means a motor vehicle or combination of motor vehicles used in commerce . . . ."  *Doc. 30 at 6; doc. 31 at 4.*

11.  NMSA § 66-1-4.11 defines a motor vehicle as "every vehicle that is self-propelled and every vehicle that is propelled by electric power obtained from batteries or from overhead trolley wires, but not operated upon rails . . . ."  *Doc. 30 at 7; doc. 31 at 4-5.*

12.  Essex issued a policy of primary liability insurance to MVCI that was in effect for the period of August 1, 2013 to August 1, 2014.  Specifically, Essex Policy No. BEP00043 provides Comprehensive General Liability ("CGL") coverage to MVCI and its employees, subject to various terms and conditions (the "Essex Policy").  *Doc. 30 at 7; doc. 31 at 5.*

13.  Pursuant to an endorsement[2] to the Essex Policy entitled "Exclusion – Aircraft, Auto or Watercraft," the standard "auto" exclusion in the CGL Coverage Form

---

[2] Black's Law Dictionary defines an "endorsement" as "[a]n amendment to an insurance policy; a rider." *Endorsement*, <u>Black's Law Dictionary</u> (10th ed. 2014).

was deleted and replaced by the following "auto" exclusion:

> This insurance does not apply to "Bodily injury" . . . arising out of any . . . "auto" . . . [w]hether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured.  This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, contracting, screening, training or monitoring of others by any insured."

*Doc. 30* at 7; *doc. 31* at 5.

14. The Essex Policy's definition of an "auto," in material part, is a land motor vehicle that is (1) designed for travel on public roads, including any attached machinery or equipment; or (2) subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; but not (3) "mobile equipment."  *Doc. 30* at 7-8; *doc. 31* at 5.

15. The Essex Policy's definition of "mobile equipment" includes (1) vehicles designed for use principally off public roads, unless (2) they are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.  *Doc. 30* at 8; *doc. 31* at 5.

16. The Essex Policy's definition of "mobile equipment" also states:

> However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos": . . . [a]ir compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.  However, "mobile equipment" does not include any land vehicles that are subject to compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed

or principally garaged.  Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos."

*Doc. 30* at 8; *doc. 31* at 5.

17. Pursuant to another endorsement to the Essex Policy entitled "Hired and Non-Owned Automobile Liability Coverage," the CGL coverage form is modified to provide "Hired" automobile liability coverage and "Non-Owned" automobile liability coverage.  The grants of coverage in the Essex Policy for "Hired" and "Non-Owned" automobile liability, respectively, read as follows:

A. HIRED AUTO LIABILITY

The insurance provided under COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

B. NON-OWNED AUTO LIABILITY

The insurance provided under COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) applies to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" by any person in the course of your business.

*Doc. 30* at 8-9; *doc. 31* at 5.

18. The Essex Policy's definitions of "hired auto" and "non-owned auto," in turn, are as follows:

"Hired auto" means any "auto" you lease, hire, rent or borrow.  This does not include any "auto" you lease, hire, rent or borrow from any of your "employees," your partners or your "executive officers," or members of their households.

"Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business.  This includes "autos" owned by your "employees," your partners or your "executive officers," or members of their households, but only while used in your business or your personal affairs.

*Doc. 30* at 9; *doc. 31* at 5.

19. The New Mexico Mandatory Financial Responsibility Act states in part that "[e]very owner or operator of a vehicle subject to the requirements of the Mandatory Financial Responsibility Act [66-5-201 NMSA 1978] shall carry evidence of financial responsibility as defined by that act in the vehicle at all times while the vehicle is in operation on the highways of this state." *Doc. 30* at 9; *doc. 31* at 5-6.

20. The New Mexico Mandatory Financial Responsibility Act also states in part:

A. No owner shall permit the operation of an uninsured motor vehicle, or a motor vehicle for which evidence of financial responsibility as was affirmed to the department is not currently valid, upon the streets or highways of New Mexico unless the vehicle is specifically exempted from the provisions of the Mandatory Financial Responsibility Act [66-5-201 NMSA 1978].

B. No person shall drive an uninsured motor vehicle, or a motor vehicle for which evidence of financial responsibility as was affirmed to the department is not currently valid, upon the streets or highways of New Mexico unless the person is specifically exempted from the provisions of the Mandatory Financial Responsibility Act [66-5-201 NMSA 1978].

*Doc. 30* at 10; *doc. 31* at 6.

21. "Evidence of financial responsibility," as used in the New Mexico Mandatory Financial Responsibility Act, "means evidence of the ability to respond in

damages for liability, on account of accidents occurring subsequent to the

effective date of the evidence, arising out of the ownership, maintenance or use

of a vehicle of a type subject to registration under the laws of New Mexico."

*Doc. 30* at 10; *doc. 31* at 6-7.

22. Mr. Desotto stated in his deposition that the vehicle in question "was not meant

to be on the road."  *Doc. 31* at 7; *doc. 34* at 4.

23. Mr. Desotto stated in his deposition that the vehicle was not supposed to be

moved with water in the tank.  *Doc. 31* at 8; *doc. 34* at 5.

24. Mr. Desotto stated in his deposition that the water tank is stationary and is not

meant to transport fluids from one place to another.  *Doc. 31* at 8; *doc. 34* at 5.

25. Mr. Desotto stated in his deposition that the vehicle in question was not meant

to transport fluids on the road.  *Doc. 31* at 8; *doc. 34* at 5.

26. Mr. Desotto stated in his deposition that the vehicle in question had never

transported water before.  *Doc. 31* at 8; *doc. 34* at 5.

27. Mr. Desotto stated in his deposition that when the vehicle in question was

filled with water, it was supposed to be set in place hydraulically, preventing

movement.  *Doc. 31* at 8; *doc. 34* at 5.

28. Mr. Desotto testified that a pump and water tank were placed on the Skytop

carrier to gain a competitive edge with competing oil well servicing companies.

*Doc. 31* at 8; *doc. 34* at 5-6.

29. The vehicle in question was comprised of the carrier, cab, pump, water storage tanks, and controls. *Doc. 31* at 8; *doc. 34* at 6.

30. Energen hired PWS to service Energen oil wells. *Doc. 31* at 8; *doc. 34* at 6.

31. During a period of three months, PWS serviced six to eight wells for Energen. *Doc. 31* at 8; *doc. 34* at 6.

32. It was PWS's understanding that MVCI had the authority to direct work at the well sites and to ensure that the work required by Energen was being completed. *Doc. 31* at 8; *doc. 34* at 6.

33. The Underlying Litigation arises out of a motor vehicle accident that occurred in Rio Arriba County, New Mexico on August 6, 2013 in which the plaintiffs in that suit allege:

   a. MVCI was performing consulting services for a well owner, Energen, which included an MVCI employee, Judson Valdez, supervising work and operations at the well site;

   b. Pedro Mendoza was an employee of PWS, another contractor hired by the well owner, Energen;

   c. On or about August 6, 2013, Judson Valdez instructed Mr. Mendoza to drive a modified vehicle from one well location to another;

   d. Mr. Mendoza did not have a Commercial Driver's License or any formal commercial driver training;

    e.   The vehicle Mr. Mendoza was instructed to operate was loaded with

        17,000 pounds of water in the vehicle's water tank;

    f.   The modified water tank did not have an anti-sloshing mechanism to

        stabilize water during transport;

    g.   While Mr. Mendoza was operating the vehicle, Mr. Mendoza lost control

        and the vehicle to rolled over.

    h.   Mr. Mendoza was fatally ejected from the vehicle during the crash.

*Doc. 31* at 9; *doc. 34* at 6.

34. In the Underlying Litigation, the plaintiffs further allege that MVCI was an

    agent of Energen:

> On or about August 6, 2013, Judson Valdez, an employee of [MVCI] and
> agent of [Energen], supervised well maintenance operations performed by
> employees of [PWS] at the [Energen] well site in Arriba County, New
> Mexico.  Well Service Equipment supplied equipment and services used
> for the work, including supplying the vehicle in question.  [Desotto],
> [PWS], Well Services Equipment, Judson Valdez, [MVCI], and [Energen]
> each knew or should have known that the vehicle supplied was
> unreasonably dangerous to be driven when loaded with water, that the
> vehicle had been loaded with produced water at the relevant well site,
> that no vacuum truck or other means of disposing of the produced water
> had been provided, that no CDL licensed driver was available to drive the
> vehicle, and that Pedro Mendoza would be required to drive the vehicle
> while loaded when moving to a second well location later in the day.

*Doc. 31* at 9; *doc. 34* at 6.

35. In the Underlying Litigation, the plaintiffs also allege that MVCI had a duty to

    exercise ordinary care for the safety of all those working for its benefit, and that

MVCI breached that duty and was negligent by virtue of the following acts and/or omissions:

(a) hiring Defendant Valdez to be a supervisor;

(b) failing to conduct a thorough and proper investigation into the record, background, and/or qualifications of Defendant Valdez;

(c) retaining Defendant Valdez as a supervisor when it knew or reasonably should have known that he was incompetent and/or dangerous;

(d) failing to adequately train and/or instruct Defendant Valdez as a supervisor and/or its other employees;

(e) failing to adequately supervise Defendant Valdez in the discharge of his duties as supervisor;

(f) failing to provide proper safety equipment for employees, subcontractors, and agents to utilize when performing work under its control;

(g) failing to implement and/or enforce adequate safety policies and procedures for its employees, subcontractors, and agents when performing work under its control;

(h) failing to implement and/or enforce adequate policies and procedures for the safe operation of equipment by its employees, subcontractors, and agents when working under its control;

(i) failing to implement and/or enforce adequate policies and procedures to

ensure the utilization of proper safety equipment by its employees, subcontractors, and agents when working under its control;

(j) failing to properly inspect vehicles, including the vehicle involved in this incident, which it owned or otherwise controlled to ensure their safe operating condition and/or compliance with all applicable state and/or federal laws;

(k) failing to properly ensure all aspects of the work being supervised were performed in compliance with applicable state and federal law;

(l) creating a dangerous condition by ordering the loading of water onto the modified vehicle when it was unsafe to do so.

(m) failing to provide means for disposing or produced water at the well site;

(n) ordering and instructing a non-licensed employee to operate a vehicle that required CDL licensure;

(o) failing to provide a properly licensed driver to move the vehicle;

(p) failing to provide a vehicle designed to be driven when loaded with water; and

(q) failing to halt on-site conduct known to be unsafe.

## IV.   ANALYSIS

Essex seeks a declaration that it has no contractual obligation, under the insurance policy provided, to defend MVCI in the Underlying Litigation or to pay any

sums that MVCI may be legally obligated to pay as damages in connection with the

Underlying Litigation.  *Doc. 1* at 1.  For the following reasons, the Court finds that Essex

is entitled to such a declaration on summary judgment.

A. ***Legal Framework for Interpreting Insurance Policy Provisions***

A federal court sitting in diversity must apply the substantive law of the forum

state.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  As "[t]he interpretation of an

insurance contract is governed by state law," the Court will apply New Mexico law in

interpreting the language of the insurance policy.  *See Houston Gen. Ins. Co. v. Am. Fence

Co.*, 115 F.3d 805, 806 (10th Cir. 1997).

Under New Mexico law, the Court "must begin with the plain language of the

insurance agreement itself."  *Union Standard Ins. Co. v. Hobbs Rental Corp.*, 566 F.3d 950,

952 (10th Cir. 2009) (citing *Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 976 (N.M. 1997)).

"When a policy contains clear and unambiguous language, the duty of the reviewing

court is to enforce that language as written as an expression of the intent of the parties."

*City of Santa Rosa v. Twin City Fire Ins. Co.*, 143 P.3d 196, 198 (N.M. Ct. App. 2006).

When evaluating competing interpretations of a policy, the court must ask "what

understanding a reasonably intelligent, non-lawyer lay person might glean from the

policy, in light of the usual meaning of the words and the circumstances leading to

purchase of the policy."  *Berry v. Fed. Kemper Life Assur. Co.*, 99 P.3d 1166, 1183 (N.M. Ct.

App. 2004).  "Finally, while we construe insurance contract ambiguities in favor of the

insured, a favored interpretation cannot lead to strained interpretations of the policy language." *Hobbs*, 566 F.3d at 952 (citing *Battishill v. Farmers Alliance Ins. Co.*, 127 P.3d 1111, 1115 (N.M. 2006).

An insurer has a duty to defend claims against its insured if "the language of a complaint states a claim that falls within the terms of the contract." *City of Albuquerque v. BPLW Architects & Engineers, Inc.*, 213 P.3d 1146, 1151 (N.M. Ct. App. 2009). Even if the duty to defend does not arise from the face of the complaint, "an insurance company is required to conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend." *G & G Servs., Inc. v. Agora Syndicate, Inc.*, 993 P.2d 751, 757 (N.M. Ct. App. 2000).

However, in New Mexico "the duty to defend is broader than the duty to indemnify." *Valley Imp. Ass'n, Inc. v. U.S. Fid. & Guar. Corp.*, 129 F.3d 1108, 1116 (10th Cir. 1997). While a duty to defend "arises out of the nature of the allegations in the complaint . . . the duty to indemnify relates to liability actually imposed on the insured for claims falling within the scope of coverage." *Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp. 2d 1157, 1193-94 (D.N.M. 2012), *on reconsideration in part*, 981 F. Supp. 2d 981 (D.N.M. 2013). Accordingly, "if the allegations of the [] complaint clearly fall

outside the provisions of the liability insurance policies, indemnity by the insurer is not required." *Id.* at 1193.

"Generally, a determination of whether an exclusion relieves an insurer from a duty to defend must be made in the primary lawsuit, and not in an action for declaratory judgment, because it is a factual question." *Lopez v. New Mexico Pub. Sch. Ins. Auth.*, 870 P.2d 745, 748 (N.M. 1994).  Thus, when the factual allegations in the complaint are ambiguous, the court in the collateral proceedings may not make factual findings to resolve the ambiguity . . . ." *Transamerica Ins. Grp. v. Hinkle-Keeran Grp., Inc.*, 1995 WL 251054, at *5 (10th Cir. 1995).   However, where a party brings a collateral proceeding seeking a declaratory judgment that it has no duty to defend in the primary lawsuit, a court may determine that no duty to defend exists if it finds that "as a matter of law, . . . all claims set forth in the complaint arose out of acts excluded from coverage under the policy." *Id.*

B. **Under the Essex Policy, the vehicle in question constitutes an "auto."**

Essex alleges that the motor vehicle accident at issue in the Underlying Litigation is not covered under the Essex Policy.  *Doc. 30* at 4.  Pursuant to the general "auto exclusion" provision, the Essex Policy does not provide coverage to MVCI for "[b]odily injury . . . arising out of any . . . 'auto' . . . ."  *Doc. 30* at 7; *doc. 31* at 5; *see doc. 30*, Ex. K. Thus, the first question to consider is whether the vehicle in question satisfies the Essex Policy's definition of an "auto."  The Court finds that it does.

16

The Essex Policy generally defines an "auto" as a land motor vehicle that is (1) designed for travel on public roads, including any attached machinery or equipment; or (2) subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; but is (3) not "mobile equipment."  *Doc. 30* at 7-8; *doc. 31* at 5; *see doc. 30*, Ex. K.  The Essex Policy's definition of "mobile equipment" specifically identifies certain land vehicles as "mobile equipment" but generally includes (1) vehicles designed for use principally off public roads or maintained primarily for purposes other than the transportation of persons or cargo, unless (2) they are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where they are licensed or principally garaged. *Doc. 30* at 8; *doc. 31* at 5; *see doc. 30*, Ex. K.

In addition to defining "mobile equipment," which is therefore excluded from being an "auto," this section of the Essex Policy explicitly provides that certain land vehicles are considered "autos" without any further analysis.  As flatly explained by the policy, "self-propelled vehicles with the following types of permanently attached equipment are not 'mobile equipment' but **will be considered 'autos'**: . . . [a]ir compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment."  *Doc. 30*, Ex. K at ESSEX 00048 (emphasis added).

It is undisputed that the vehicle in question was a self-propelled Skytop carrier to

which a large pump and 100 barrel water tank were permanently attached.  Moreover, the attached equipment was used by PWS to service oil and gas wells.  *Doc. 30* at 6, 14; *doc. 31* at 3; *see doc. 30*, Ex. K.  Consequently, by the clear terms of the Essex Policy, the vehicle is considered an "auto."

The parties briefed the issues of whether the vehicle satisfies the Essex Policy's more general definition of an "auto," such as whether the vehicle was designed for travel on public roads and whether it was subject to a compulsory or financial responsibility law or other motor vehicle insurance law.  However, these disputes need not be addressed because the vehicle is by definition an "auto" pursuant to paragraph 12(f) of the policy.

    C.  **<u>Under the Essex Policy, the vehicle in question does not constitute a "hired auto."</u>**

Although the vehicle constitutes an "auto" under the Essex Policy and is therefore excluded from coverage under the "auto exclusion" language, the policy could alternatively obligate Essex to defend and indemnify MVCI for the motor vehicle accident under the subsequent "Hired Auto Liability" endorsement.  *See doc. 30* at 8-9; *doc. 31* at 5.  This provision covers bodily injury arising out of the use of "any 'auto' you lease, hire, rent or borrow."  *Doc. 30* at 9; *doc. 31* at 5; *see doc. 30*, Ex. K.  In alleging that the accident is covered under this endorsement, MVCI first notes that the plaintiffs in the Underlying Litigation allege that MVCI is liable as an agent of Energen because MVCI "supervised work at the well site, directed the work of PWS employees, and

oversaw work at the well site." *Doc. 31* at 22.  MVCI argues that because MVCI could

be considered an agent of Energen, it is reasonable to conclude that "Energen, through

[MVCI], hired PWS and its modified truck." *Id.*

To accept MVCI's argument would be to conflate the various definitions of the

word "hire."  Black's Law Dictionary defines "hire" as:

> 1. To engage the labor or services of another for wages or other payment.  2. To
> procure the temporary use of property, usu. at a set price.  3.  To grant the
> temporary use of services <hire themselves out>.

*Hire*, <u>Black's Law Dictionary</u> (10th ed. 2014).  Indeed, assuming that MVCI was an agent

of Energen, one could argue that MVCI hired PWS.  However, this hiring would fall

under the concept of "hiring" embodied in the first definition – that MCVI engaged the

labor or services of PWS for wages or other payment.  But it does not follow that all of

PWS's vehicle were therefore "hired" within the meaning of the policy because the

context of the relevant policy language does not fit this concept of "hiring."

The policy refers to "any 'auto' you lease, hire, rent or borrow."  *Doc. 30*, Ex. K at

ESSEX 00063.  One cannot engage the labor of an auto for wages.  Instead, this language

obviously refers to the second, and distinct, definition of hiring – the procurement of

the temporary use of property.  Here, the vehicle was owned by PWS and operated by

PWS employees, and it was used in connection with PWS providing service to Energen

oil wells.  *Doc. 30* at 5; *doc. 31* at 3.  There is no indication that MVCI, whether acting as

an agent of Energen or otherwise, ever procured the temporary use of the vehicle.  On

the contrary, the evidence establishes that the vehicle was always in the possession and control of PWS and its employees.  *Doc. 30* at 5-6; *doc. 31* at 3.  Not only would accepting MVCI's argument run contrary to the usual meaning of the word "hire" in that context, it would mean that the Essex Policy intended to provide coverage for any auto owned by *any company* which is hired to perform work on MVCI's behalf.  The Court will not adopt such an unreasonable interpretation.

Because PWS's vehicles were not "hired" by MCVI within the meaning of the policy, the "hired auto" endorsement does not provide coverage under the facts in this case.

D. <u>**Under the Essex Policy, the vehicle in question does not constitute a "non-owned auto."**</u>

Given that the vehicle in question is an "auto" and does not fit the definition of a "hired auto," the final possible font of coverage is the Essex Policy's "Non-Owned Auto Liability" endorsement.  *See doc. 30* at 8-9; *doc. 31* at 5.  This provision covers bodily injury arising out of the use of "any 'auto' you do not own, lease, hire, rent or borrow which is used in connection with your business."  *Doc. 30* at 9; *doc. 31* at 5; *see doc. 30*, Ex. K.  The Essex Policy specifically explains that this provision includes autos "owned by your 'employees,' your partners or your 'executive officers,' or members of their households, but only while used in your business or your personal affairs.  *Doc. 30* at 9; *doc. 31* at 5; *see doc. 30*, Ex. K.  As PWS, the owner of the vehicle, is not an employee, partner, or executive officer of MVCI, the specific examples listed in the endorsement

do not establish coverage under the facts of this case and the Court must consider the scope of the general language of the provision. *See doc. 30* at 5; *doc. 31* at 3.

The Tenth Circuit has provided guidance on how to analyze the scope of such "non-owned auto" language in circumstances closely analogous to the present case. *See United Standard Ins. Co. v. Hobbs Rental Corp.*, 566 F.3d 950 (10th Cir. 2009). In *Hobbs*, an oil drilling company entered into a contract with an independent contractor to move heavy equipment from an oil field to the oil drilling company's yard. *Id.* at 951. While the independent contractor's employee was transporting the equipment, part of the independent contractor's truck touched a power line and the employee was electrocuted. *Id.* The employee sued the oil drilling company for negligence, and an insurance company filed a declaratory judgment action due to a business auto policy it had provided to the oil drilling company. *Id.* The insurance policy, similar to the Essex Policy, provided coverage for "non-owned autos," which it defined as "those autos you do not own, lease, hire, rent or borrow that are used in connection with your business." *Id.*

As in the instant case, the parties in *Hobbs* did not dispute that the independent contractor exercised "nearly complete control over the transport job." *Id.* In addition, the independent contractor "used its own employee and truck, expecting and receiving neither assistance nor supervision from [the oil drilling company]." *Id.* Finally, the Court noted that "[t]he only relevant dispute related to whether an [employee of the oil

drilling company] directed [the independent contractor]" to move the equipment before the accident occurred.  *Id.* at 952.

In interpreting the language of the insurance policy, the Tenth Circuit Court of Appeals ruled that the policy "[did] not cover vehicles owned and operated by an independent contractor doing business with the insured."  *Id.* at 951.  In reaching this conclusion, the court noted that the "in connection with" language, although not defined by the policy, was "intended to cover a more narrow and foreseeable set of circumstances involving [the oil drilling company's] employees or members of their household."  *Id.* at 953.  The court ruled that the policy did not cover the accident for two reasons: (1) "[t]he accident occurred without direct [supervision by the oil drilling company], and occurred during a job [the independent contractor] had been retained to perform in the ordinary course of business;" and (2) "a reasonable insured would not view [the oil drilling company's] business automobile policy as extending coverage to independent contractors over which [the oil drilling company] did not exercise control."  *Id.* at 954.

Here, while the policy does not define which autos are "used in connection with your business," the Court sees no material distinction between the Essex Policy and the insurance policy in *Hobbs.  See, generally, docs. 30-13, 30-14.*  Similar to the policy in *Hobbs*, the Essex Policy specifically lists examples of what types of autos are covered, including those owned by employees, partners, executive officers, or members of their

households.  *Doc. 30* at 9; *doc. 31* at 5.  None of these examples would pertain to an auto

owned by PWS, an independent contractor doing business with MVCI.  Additionally,

the two reasons that the Tenth Circuit found that the policy in *Hobbs* did not apply to

independent contractors apply with equal force here.  First, the accident occurred while

a PWS employee was performing a job which PWS was hired to perform in the ordinary

course of business, and MVCI did not exercise direct supervision over the work.[3]  *Doc.

30* at 5-6; *doc. 31* at 3.  Second, a reasonable insured would not interpret the Essex Policy

to cover autos which are not owned or controlled by MVCI, as such an interpretation

could extend coverage to all autos owned by companies with which MVCI does

business.  Therefore, it appears that *Hobbs* dictates that the "non-owned auto" language

in the Essex Policy does not provide coverage for the vehicle in question.

MVCI argues that the *Hobbs* result does not control this case because the Essex

Policy provides coverage for bodily injury arising out of the use of a non-owned auto

"by any person," whereas the *Hobbs* policy omits such language.  *See doc. 31* at 23.

However, the Tenth Circuit's reason for denying coverage to independent contractors

was not that the policy implicitly covered only use of the vehicle by employees of the

insured and members of their households.  Rather, the Tenth Circuit found that "the

---

[3] Although the plaintiffs in the Underlying Litigation allege that Mr. Valdez instructed Mr. Mendoza to drive the vehicle from one well site to another, this is insufficient to constitute direct supervision under *Hobbs*.  *Doc. 30* at 5; *doc. 31* at 3; *Hobbs*, 566 F.3d at 954 ("[e]ven if an HRC employee told Brunson *where* to place the equipment, it would not vitiate Brunson's control over the details of the work.")

[independent contractor's] truck involved in the accident was not 'used in connection with' [the oil drilling company's] business and therefore [was] not a 'non-owned auto' under the . . . insurance policy."  *Hobbs*, 566 F.3d at 955.

Here, MVCI correctly notes that the Essex Policy includes the phrase "by any person" in describing the insurance policy's coverage of use of non-owned autos.  *Doc. 30* at 8-9; *doc. 31* at 5.  However, that phrase is missing from the *definition* of a "non-owned auto," which is nearly identical to the definition in *Hobbs*.  *Doc. 30* at 9; *doc. 31* at 5.  Thus, the phrase "by any person" cannot be considered when determining whether the vehicle constitutes a "non-owned auto," but instead would be considered only at the next step when determining whether coverage would extend to the particular use of the "non-owned auto."  As the Court considers the definitions of "non-owned auto" in the Essex Policy and the *Hobbs* policy to be identical in all material respects, the Court must follow *Hobbs* and hold that PWS's truck involved in the accident was not "used in connection with" MVCI's business and therefore does not constitute a "non-owned auto" under the Essex Policy.

## V.   CONCLUSION

Thus, the Court finds that, as a matter of law, all claims set forth by the plaintiffs in the Underlying Litigation arose out of the use of a vehicle excluded from coverage under the Essex Policy.  Consequently, Essex has no duty to defend or indemnify MVCI or the Estate of Judson Valdez in relation to the Underlying Litigation.  Essex's Motion

for Summary Judgment (*doc. 30*) is GRANTED.

  IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**